**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEALTHY FUTURES OF TEXAS, individually and on behalf of all other similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., )<br><br>Defendants. ) | Civil Action No. 1:18-cv-00992 |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS-MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 2

PROCEDURAL HISTORY............................................................................................... 5

STANDARD OF REVIEW ............................................................................................... 8

ARGUMENT ..................................................................................................................... 8

   I.   Plaintiff's Claim Is Barred by Laches .............................................................. 8

   II.  Plaintiff's Claim Fails on the Merits................................................................ 12

      A.   The ADA and Leiter Preclude Agreements Purporting to Obligate the Government For More Than One Fiscal Year ................................................................. 13

      B.   Defendant Has Not Terminated the Plaintiff's Grants within the Meaning of the Department's Regulations ...................................................................... 16

      C.   The Terms of the Grant Awards Support Defendants' Position .................................... 20

      D.   Because No Grant Was "Terminated," Plaintiff's APA Claim Fails ............................ 21

CONCLUSION................................................................................................................. 22

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) ........................................................................................ 8

*Am. Univ. Park Citizens Ass'n v. Burka,*
   400 A.2d 737 (D.C.1979) ............................................................................... 12

*Birmingham Realty Co. v. Gen. Servs. Admin.,*
   497 F. Supp. 1377) (N.D. Ala. 1980) ............................................................. 9

*Califano v. Sanders,*
   430 U.S. 99 (1977) .......................................................................................... 8

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ...................................................................................... 16

*Comptroller Gen. Warren To The Postmaster Gen'l,*
   28 Comp. Gen. 553 (1949) ........................................................................... 14

*Cook Cty. Legal Assistance Found., Inc. v. Pauken,*
   573 F. Supp. 231 (N.D. Ill. 1983) .................................................................. 9

*Cray Research, Inc. v. United States,*
   44 Fed. Cl. 327 (1999) .................................................................................. 15

*Galliher v. Cadwell,*
   145 U.S. 368 (1892) ........................................................................................ 9

*Goodyear Tire & Rubber Co. v. United States,*
   276 U.S. 287 (1928) ...................................................................................... 15

*Gov't Sys. Advisors, Inc. v. United States,*
   13 Cl. Ct. 470 (1987) .................................................................................... 13

*Gull Airborne Instruments, Inc. v. Weinberger,*
   694 F.2d 838 (D.C. Cir. 1982) ....................................................................... 9

*Healthy Teen Network v. Azar,*
   Civil Action No. CCB-18-468, 2018 WL 1942171 (D. Md. Apr. 25, 2018) ................ 7, 17, 18

*Honorable Alan Cranston,*
   B-239435, 1990 WL 10007871 (Comp. Gen. Aug. 24, 1990) ..................... 15

*In re Nw. Rural Opportunities, Inc.*,
   DAB 324, 1982 WL 189564 & n.1 (1982) ............................................................ 19

*In re Vance-Warren Comprehensive Health Plan, Inc.*,
   DAB No. 2180, 2008 WL 2649498 (H.H.S. Dep't App. Bd. June 18, 2008) ............................ 5

*\*Indep. Bankers Ass'n of Am. v. Heimann*,
   627 F.2d 486 (D.C. Cir. 1980) ............................................................ 8, 10

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Donovan*,
   746 F.2d 855 (D.C. Cir. 1984) ............................................................ 13

*Jones & Artis Constr. Co. v. D.C. Contract Appeals Bd.*,
   549 A.2d 315 (D.C. 1988) ............................................................ 9

*Kay v. Austin*,
   621 F.2d 809 (6th Cir. 1980) ............................................................ 9

*King Cty. v. Azar*,
   No. 2:18-cv-00242-JCC (W.D. Wash., filed Feb. 15, 2018) ............................ 7

*\*Leiter v. United States*,
   271 U.S. 204 (1926) ............................................................ 13, 14, 15

*\*Lincoln v. Vigil*,
   508 U.S. 182 (1990) ............................................................ 21

*LTMC/Dragonfly, Inc. v. Metro. Wash. Airports Auth.*,
   699 F. Supp. 2d 281 (D.D.C. 2010) ............................................................ 9, 10

*Mahan v. Tash*,
   703 F. Supp. 130 (D.D.C. 1989) ............................................................ 12

*Milk Train, Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002) ............................................................ 21

*NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*,
   753 F.2d 131 (D.C. Cir. 1985) ............................................................ 9

*Nevada v. Dep't of Energy*,
   400 F.3d 9 (D.C. Cir. 2005) ............................................................ 13

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.*
   *("PPGWNI"), No. 2:18-cv-00055-TOR*,
   2018 WL 1934070 (E.D. Wash. Apr. 24, 2018) ............................................................ passim

iv

*Policy & Research, LLC v. Dep't of Health & Human Servs.*, No. 18-cv-346-KBJ,
    2018 WL 2184449 (D.D.C. May 11, 2018) ...................................................... passim

*Rochon v. Lynch*,
    139 F. Supp. 3d 394 (D.D.C. 2015) ............................................................... 8

*Southern Mutual Help Association v. Califano*,
    574 F.2d 518 (D.C. Cir. 1977) ...................................................................... 19

**Statutes**

1 U.S.C. § 105 ................................................................................................ 15

5 U.S.C. § 701(a)(2) ...................................................................................... 21

31 U.S.C. § 1112(c) ...................................................................................... 13

38 U.S.C. § 30 .............................................................................................. 15

41 U.S.C. § 3903(b) ...................................................................................... 15

The Congressional Budget and Impoundment Control Act of 1974, Pub. L.
    No. 93–344, § 801(a), 88 Stat. 297 (1974) ................................................... 13

Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034 (2009) .................. 2

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141,
    https://www.congress.gov/115/bills/hr1625/BILLS-115hr1625enr.pdf .................................... 2

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................... 8

**Regulations**

42 C.F.R. § 50.404(a)(1) ......................................................................... 5, 19, 21

45 C.F.R. pt. 16 ..................................................................................... 5, 19, 21

45 C.F.R. § 75.2 .................................................................................... 12, 16, 18

45 C.F.R. § 75.207 ........................................................................................ 18

45 C.F.R. § 75.371 ........................................................................................ 18

45 C.F.R. § 75.372 ........................................................................................ 17

45 C.F.R. § 75.373 ................................................................................................ 17

45 C.F.R. § 75.381 ................................................................................................ 18

45 C.F.R. § 75.386 ................................................................................................ 18

Federal Awarding Agency Regulatory Implementation of Office of Management and
    Budget's Uniform Administrative Requirements, Cost Principles, and Audit
    Requirements for Federal Awards,
    79 Fed. Reg. 75,871 (Dec. 19, 2014) .................................................................... 20

## **Other Authorities**

GAO Principles of Federal Appropriations Law, GAO-06-382SP (3rd ed. 2015),
    *available at* https://www.gao.gov/legal/red-book/overview ......................................... 13, 14, 15

H.R. 3358, 115th Cong. (2017) .......................................................................... 5

## INTRODUCTION

Plaintiff, a participant in the Teen Pregnancy Prevention Program ("TPP Program"), learned in July of 2017 that the United States Department of Health & Human Services ("HHS") had chosen not to give it a continuation award for FY 2018 and FY 2019.  But it chose to wait nearly ten months before filing this complaint, even though other TPP Program grantees filed suit in February of this year to challenge HHS's decision.  Now, just over ten weeks after those lawsuits were filed, Plaintiff has sued to vacate the July 2017 decision and to require HHS to now process applications for continuation awards on behalf of itself and a putative class of other grantees.  This delay is both unreasonable and unexplained by Plaintiff.  HHS would be seriously prejudiced if Plaintiff's late-breaking request for relief were to be granted; the agency has invested significant resources in evaluating the TPP Program and developing a new competitive funding opportunity announcement ("FOA"), which was publicly announced before Plaintiff filed suit.  Plaintiff's untimely claims are barred by laches and should be dismissed.

Plaintiff's claim also fails on the merits.  As this Court acknowledged, an agency's decisions regarding the allocation of grant funding are presumptively committed to agency discretion as a matter of law.  But Plaintiff reads HHS regulations to all but eliminate that discretion, except in narrow circumstances where they permit "termination" of a grant.  That reading forecloses HHS from ending annual awards of continuation funding for programmatic reasons, such as advances in science, or policy changes within the bounds of the authorizing statutes, across all of the grant programs it manages.  Just as troubling, it puts HHS regulations at odds with the Anti-Deficiency Act ("ADA"), which protects the prerogatives of Congress and the public fisc by forbidding federal departments from committing federal funds before they are appropriated.  It also contradicts the grant documents, which align with the ADA by limiting

funding to one-year periods.  Plaintiff agreed to the terms of those documents when it drew down its letter of credit for a third year of TPP Program funding.

Accordingly, the Court should deny Plaintiff's motion and dismiss Plaintiff's complaint with prejudice or, in the alternative, enter judgment in HHS's favor on Plaintiff's claims.

## STATEMENT OF FACTS

In 2010, Congress appropriated $110 million to HHS to administer the TPP Program.[1] Congress renewed this funding in March 2018.  Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, https://www.congress.gov/115/bills/hr1625/BILLS-115hr1625enr.pdf.  Congress funded the TPP Program for making "*competitive* contracts and grants."  *Id.* (emphasis added).

After five years of administering the program, HHS issued new Funding Opportunity Announcements ("FOAs") for the TPP Program in 2015.  The FOAs announced HHS would fund TPP awards using a one year "budget period"—that is, awarding one year of funds at a time—and a "project period" of "up to five years," subject to future appropriations, compliance with grant terms and conditions, and HHS's discretion over whether to continue awards or issue a new competition.  *See, e.g.*, Decl. of Michael J. Gerardi ("Gerardi Decl."), Ex. A, Tier 1A Funding Opportunity Announcement, Office of Adolescent Health, Department of Health and

---

[1] The original appropriation makes funds available for

> [C]ompetitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants, of which not less than $75,000,000 shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, of which not less than $25,000,000 shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy, and of which any remaining amounts shall be available for training and technical assistance, evaluation, outreach, and additional program support activities: *Provided further*, That of the amounts provided under this heading from amounts available under section 241 of the PHS Act, $4,455,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches[.]

Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).

Human Services, at 35 (2015).  The FOAs thus did not guarantee funding for any year beyond the first year of award.  Rather, the FOAs stated that for "[e]ach year of the approved project period, grantees are required to submit a noncompeting application which includes a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year."  *Id.* at 72.  The FOAs also explained that "recipients must comply with all terms and conditions outlined in their grant awards, the Department of Health and Human Services (HHS) Grants Policy Statement, requirements imposed by program statutes and regulations and HHS grant administration regulations, as applicable, as well as any requirements or limitations in any applicable appropriations acts."  *Id.* at 68.

Plaintiff, a participant the TPP Program, received its first notices of award in the summer of 2015, which included a budgeted award of financial assistance for one year only (July 1, 2015 to June 30, 2016), along with "recommended future support" for subsequent budget years.  *See, e.g.*, Decl. of Dr. Janet Realini ("Realini Decl."), ECF No. 6-1, Ex. A, Notice of Award for 2015-16, at 1.  Awards for subsequent budget periods were explicitly denominated "Non-Competing Continuation" awards.  *See, e.g.*, Realini Decl., Ex. B, Notice of Award for 2016-17, at 1.  Consistent with the FOAs, the awards indicated that future years of funding were contingent on HHS approval.  Specifically, they stated that grantees must "comply with all terms and conditions outlined in the grant award, including grant policy terms and conditions contained in applicable [HHS] Grants Policy Statements," and then hyperlinked to those policies on HHS's website.  *Id.* at 5.  The awards also stated that grantees accept the terms and conditions of the grant award by drawing down their award money.  *Id.* at 1.

In the Grants Policy Statement ("GPS") incorporated into those awards, HHS repeatedly declares that continuation awards beyond the current budget year are contingent on the agency's

discretionary decision to issue them.  It further provides that this discretionary determination is based in part on its assessment of whether government interests have changed such that future funds should be recompeted.  When describing the "project period" system, the GPS states that although "project periods" may "indicat[e] the [operating division's] intention to provide continued financial support beyond the budget period," such projections:

> are contingent on satisfactory progress, the availability of funds, and *the continued best interest of the Federal government*.  They are not guarantees that the project or program will be funded or will be funded at those levels, and they create *no legal obligation to provide funding beyond the ending date of the current budget period* as shown in the [notice of award].

Gerardi Decl., Ex. B, U.S. Department of Health and Human Services, Grants Policy Statement, at I-34 (emphasis added).  The "Terms and Conditions" of the Grants Policy Statement further reserves HHS's broad discretion to deny a continuation award:

> An [operating division] may decide not to make a non-competing continuation award within the current competitive segment for one or more of the following reasons:
>
> • Adequate Federal funds are not available to support the project.
> • A recipient failed to show satisfactory progress in achieving the objectives of the project.
> • A recipient failed to meet the terms and conditions of a previous award.
> • *For whatever reason, continued funding would not be in the best interests of the Federal government.*

*Id.* at II-89 (emphasis added).

Under the "project period" system, grants are "programmatically approved" for a period of up to five years, "but are funded in annual increments called budget periods."  *Id.* at I-34. Because continuation awards are not guaranteed, each year grantees must submit an "official request to OAH for continued funding" known as a "non-competing continuation application." Gerardi Decl. Ex. C, U.S. Department of Health and Human Services, Office of Adolescent Health, Guidance for Preparing a Non-Competing Continuation Grant Application, at 3 (Nov.

4

2016).[2]  If HHS approves a grantee's request for funding—whether an initial award or a continuation award—the grantee receives a "Notice of Award" that includes the "[a]pproved project period and budget period start and end dates," and distinctly, the "[a]mount of Federal funds authorized for obligation by the recipient" within the next "budget period" in response to the grantee's application for funding.  Gerardi Decl., Ex. B at I-33.

Decisions to deny continuation awards are appealable only when the grantee failed "to meet the terms and conditions of a previous award," which means that they are almost always discretionary.  *Id.* at II-89.  If HHS makes a policy decision not to issue continuation awards, the departmental appeals board "has no power to review" the decision, as such decisions "generally are matters committed to the federal agency's discretion."  *In re Vance-Warren Comprehensive Health Plan, Inc.*, DAB No. 2180, 2008 WL 2649498, at *1 (H.H.S. Dep't App. Bd. June 18, 2008).  And HHS's current rules draw a sharp distinction between "terminations" of an award (which can always be appealed) and decisions not to issue a continuation award (which can only be appealed when the agency asserts the grantee has violated the terms of a previous award).  45 C.F.R. pt. 16, App'x A, at C(a)(2)-(3); 42 C.F.R. § 50.404(a)(1), (4).

## PROCEDURAL HISTORY

Funding for the TPP Program was a subject of significant debate in the negotiations over the FY 2018 budget.  The President's FY 2018 budget request, announced in May 2017, recommended eliminating the program.  *See* Gerardi Decl. Ex. D, U.S. Department of Health and Human Services, 2018 Budget Request for General Departmental Management.  The HHS House appropriations bill would have declined to fund the program.  H.R. 3358, 115th Cong.

---

[2] *See also* Gerardi Decl. Ex. B at I-16 (defining non-competing continuation application as "a request … for funding the second or subsequent budget period within an approved competitive segment"); *id.* at B-3 (defining "competitive segment" as "[t]he initial project period recommended for support (up to 5 years) or each extension of a project period resulting from a competing continuation award").

(2017).  In response, a number of members of Congress expressed their support for the program. Gerardi Decl. Ex. E, Letter from 149 House Members to the Honorable Tom Price, M.D. (July 25, 2017); Gerardi Decl. Ex. F, Letter from 37 Senators to the Honorable Tom Price, M.D. (July 21, 2017).  Disagreement over the future of the TPP Program was a contributing factor to the larger budget impasse.  *See* Gerardi Decl. Ex. G, Jennifer Haberkorn & Sarah Ferris, "Planned Parenthood Defunding Threatens Government Spending Package," Politico, Mar. 7, 2018 (noting disagreement between Republicans and Democrats over riders that would "ax the Teen Pregnancy Prevention Program").

With the fate of the TPP Program uncertain in Congress, and having further examined the priorities and effects of previous awards under the program, HHS awarded FY 2017 funds to Plaintiff in the summer of 2017, but announced it would not issue continuation awards for FY 2018.  *See, e.g.*, Realini Decl., Ex. C, Notice of Award for 2017-18, at 1.  The agency announced this change in interests and priorities publicly.  Gerardi Decl. Ex. H, Press Release, U.S. Department of Health and Human Services, Office of the Assistant Secretary for Health, "Teen Pregnancy Prevention Program Facts," (Aug. 28, 2017); Gerardi Decl. Ex. I, Letter from Barbara Pisaro Clark, Acting Assistant Secretary of Legislation, U.S. Department of Health and Human Services to Senator Patty Murray (Nov. 22, 2017).  It also informed grantees of this decision in July 2017 in the text of their awards for the 2017-18 "budget period," which shortened the "project period" of their awards to end on June 30, 2018.  When Plaintiff accepted and began drawing down their FY 2017 funds, they accepted the change in project period and the underlying terms.  Decl. of A. Michon Kretschmaier ("Kretschmaier Decl.") ¶ 2.

An initial group of nine plaintiffs challenged HHS's decision in a series of four lawsuits filed on February 15, 2018.  In each suit, Defendant maintained, consistent with HHS's prior

practice, that the agency would need two months of lead time in order to process continuation applications. *Id.* ¶ 3. Accordingly, plaintiffs agreed to briefing schedules that permitted the Court to enter judgment with sufficient time for HHS to process continuation applications and issue awards, if warranted, in accordance with previous practice. *Id.* ¶ 4. In three of the cases, district courts have ruled in the plaintiffs' favor and have ordered HHS to process the continuation applications of these grantees in accordance with HHS's usual practice. *Policy & Research, LLC v. Dep't of Health & Human Servs.*, No. 18-cv-346-KBJ, 2018 WL 2184449 (D.D.C. May 11, 2018); *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs. ("PPGWNI")*, No. 2:18-cv-00055-TOR, 2018 WL 1934070 (E.D. Wash. Apr. 24, 2018); *Healthy Teen Network v. Azar*, Civil Action No. CCB-18-468, 2018 WL 1942171 (D. Md. Apr. 25, 2018). A fourth suit remains pending. *King Cty. v. Azar*, No. 2:18-cv-00242-JCC (W.D. Wash., filed Feb. 15, 2018). On April 20, HHS announced a recompetition of TPP Program funds, which will permit the agency to award funds under the program on a competitive basis, to the extent that funds remain available after compliance with the judicial orders described above; the agency intends to do so by the end of the fiscal year on September 30, 2018, as required by law.[3] Plaintiff filed this suit on April 27, 2018, seventy-three days after the initial wave of grantees filed suit, and nearly ten months after it learned in July 2017 of HHS's decision not to award it continuation funding.

---

[3] *See* Gerardi Decl., Ex. J, Department of Health and Human Services, Office of Adolescent Health, Office of the Assistant Secretary for Health, "Announcement of Availability of Funds for Phase I Replicating Programs (Tier 1) Effective in the Promotion of Healthy Adolescence and the Reduction of Teen Pregnancy and Associated Risk Behaviors"; Gerardi Decl., Ex. K, Department of Health and Human Services, Office of Adolescent Health, Office of the Assistant Secretary for Health, "Announcement of Availability of Funds for Phase I New and Innovative Strategies (Tier 2) to Prevent Teenage Pregnancy and Promote Healthy Adolescence."

## STANDARD OF REVIEW

Plaintiff seeks expedited summary judgment, and Defendants have cross-moved for summary judgment or to dismiss in the alternative.  Judgment under Civil Rule 56 is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Judgment under Civil Rules 12(b)(1) or 12(b)(6) is appropriate if, assuming the truth of all well-pleaded factual allegations in the complaint, Plaintiff has failed either to establish this Court's jurisdiction or to state a claim upon which relief can be granted.  "Where, as here, a defendant maintains that the case should be terminated *either* for defective pleadings *or* because there is no genuine issue of material fact to be presented to a jury, the court may review the parties' arguments with respect to both of those grounds to determine the extent to which the motion can be sustained."  *Rochon v. Lynch*, 139 F. Supp. 3d 394, 400 (D.D.C. 2015), *aff'd*, 664 F. App'x 8 (D.C. Cir. 2016).

## ARGUMENT

### I.    Plaintiff's Claim Is Barred by Laches

Plaintiff seeks remedies that "are equitable in nature," and as such, "[t]he defense of laches [can] be asserted if the Government is prejudiced by a delay."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967) (discussing applicability of equitable defenses in APA cases), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).  An otherwise-meritorious claim may be barred by laches, even when it falls within the statute of limitations, "if two requirements are met: (1) unreasonable delay in bringing the claim for relief and (2) prejudice caused by that delay."  *Indep. Bankers Ass'n of Am. v. Heimann*, 627 F.2d 486, 488 (D.C. Cir. 1980).  This defense "does not depend solely on the time that has elapsed between the alleged wrong and the institution of suit; it is 'principally a question of the inequity of permitting the

claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties.'" *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982) (quoting *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892)).  In addition to encouraging litigants to bring claims "when courts are in the best position to resolve disputes," laches prevents plaintiffs from "gain[ing] the unfair advantage of hindsight, while defendants suffer the disadvantage of an uncertain future outcome." *NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985).  Those goals would be defeated if Plaintiff's claim were allowed to move forward, and so a finding of laches is required here.

Plaintiff's delay in bringing this claim was unreasonable given the factual circumstances of the TPP Program.  The laches inquiry is a flexible one, and no fixed amount of delay is required.  "Whether the doctrine bars an action in a particular case depends upon the circumstances of that case." *Gull Airborne*, 694 F.2d at 843; *see also Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (holding laches barred claim of plaintiff who "waited until nearly two weeks after he knew the choice of the candidates would be made and further delayed eleven days before filing suit").  And in the context of government grants and contracts, expedient assertion of claims is vital.  "Customarily, complaints about the solicitation and award of contracts … must be quickly asserted and expeditiously resolved so that the contract can be awarded and the job begun." *LTMC/Dragonfly, Inc. v. Metro. Wash. Airports Auth.*, 699 F. Supp. 2d 281, 293 (D.D.C. 2010) (quoting *Jones & Artis Constr. Co. v. D.C. Contract Appeals Bd.*, 549 A.2d 315, 319 (D.C. 1988)); *Cook Cty. Legal Assistance Found., Inc. v. Pauken*, 573 F. Supp. 231, 233 (N.D. Ill. 1983) (plaintiff's challenge to denial of funding as VISTA sponsor under the APA barred by laches after two-year delay in assertion); *Birmingham Realty Co. v. Gen. Servs.*

*Admin.*, 497 F. Supp. 1377, 1390-91) (N.D. Ala. 1980) (two-month delay sufficient for a laches defense in a bid protest case).

In *Dragonfly*, this Court held that a delay of eighteen months in filing a lawsuit to challenge a three-year contract award was sufficient to satisfy the "delay" prong of the laches inquiry, even though the plaintiff spent much of that time pursuing administrative bid protest procedures. The Court concluded that given the nature of government contracting, "equity dictates in such circumstances that a bidder seeking to pursue further remedies do so in a reasonably expeditious manner." *Dragonfly*, 699 F. Supp. 2d at 293. Likewise, the Plaintiff's delay in filing suit was unreasonable in the context of the decision at issue here. The relevant timeframe for assertion of rights is even shorter because agencies must make plans to spend appropriated money before the fiscal year ends and engage in the planning and review such spending entails. Plaintiff acknowledges that the action resulting in its alleged harm was the Notice of Award it received in early July of 2017. Realini Decl. ¶¶ 8-9. That announcement was made ten months ago. Even after grantees began filing lawsuits to challenge HHS's decision, Plaintiff (and the putative class it represents) waited another two-and-a-half months before seeking to assert its rights. That is not "reasonably expeditious" behavior.

More importantly, allowing Plaintiffs' claim to go forward would unfairly prejudice HHS. When a litigant "create[s] an impression of acquiescence that has led others to make substantial financial commitments," laches should apply to defeat the claim. *Heimann*, 627 F.2d at 488. Although Plaintiff was aware of HHS's decision for nearly ten months prior to filing suit, and even submitted a letter to the agency regarding HHS's action in August of 2017, it gives no justification as to why it waited so long to assert its rights. Meanwhile, HHS spent a year

10

analyzing the TPP Program and developing a new approach to the program at a cost to the agency of millions of dollars and many hours of staff time. Kretschmaier Decl. ¶ 5.

On April 20, 2018 HHS posted two new funding opportunity announcements to inform the public of this new approach and invite competitive grant applications for the funding at issue, with applications due June 29, 2018. Kretschmaier Decl. ¶ 6. Had the agency waited any longer to initiate the recompetition, it would have difficulty meeting its legal obligation of spending TPP Program funds by September 30, 2018, while adequately performing the review necessary to ensure applicants' proposals will serve the goals of the grant program. *Id.* These efforts are further complicated by the agency's need to process continuation applications at the same time it is reviewing competitive grant applications, when it would normally be engaged in only one of the two activities. *Id.* ¶ 7. Plaintiff's requested relief interferes with the recompetition by reducing the funds available to the agency to award to new grantees and diminishing HHS's investment in reviewing and redesigning the TPP Program. *Id.* ¶ 9.

In addition to the agency's own efforts to set up the recompetition, members of the public can reasonably be expected to commit resources to participate in that recompetition. Kretschmaier Decl. ¶ 8. Preparatory work for drafting a grant proposal is a significant undertaking that often includes devising a skeletal plan for a project, contacting potential partners and obtaining memorandums of understanding from them, meeting with school principals and curriculum coordinators in the communities they wish to serve, and selecting a project evaluator. *Id.* On May 9, more than 800 entities participated in a webinar to learn more about the grant-writing process, a significant increase from the approximately 500 entities that participated in a similar webinar hosted in 2015. *Id.*

With no evidence of Plaintiff's intent to challenge the legality of HHS's action in court, and the deadline for making arrangements to obligate TPP Program funds fast approaching, HHS "ha[d] good reason to believe that the alleged rights … [had] been abandoned" and was within its rights to offer them to the public in the new funding opportunity announcement. *Mahan v. Tash*, 703 F. Supp. 130, 132 (D.D.C. 1989) (quoting *Am. Univ. Park Citizens Ass'n v. Burka*, 400 A.2d 737, 742 (D.C.1979)). The resources expended to launch the recompetition and the reliance of the public on that recompetition dictate dismissal of Plaintiff's claim on laches grounds.

## II.    Plaintiff's Claim Fails on the Merits

In its *Policy & Research* decision, this Court correctly recognized that HHS's decisions regarding the allocation of funding under discretionary grant programs, such as the TPP Program, are presumptively committed to agency discretion and not subject to judicial review. *Policy & Research*, 2018 WL 2184449, at *7-8. It also recognized that HHS had limited its discretion to terminate individual grants by regulation. *Id.* *8. This Court erred, however, in concluding that HHS engaged in a termination by announcing that it would recompete the entire program. By concluding that a program-wide recompetition was a termination under 45 C.F.R. § 75.2, the Court effectively eliminated HHS's discretion to withhold further continuing funding within a "project period." This holding would mean that HHS must go through its termination procedures to make program-wide changes in administering grants in the program, even where the agency seeks to respond to new advances in scientific knowledge, or to make policy changes within the permissible scope of its statutory authorization. The regulations do not require this result. HHS is entitled to judgment as a matter of law on Plaintiff's claim, and so the Court should deny Plaintiff's motion and grant Defendants' motion for at least the reasons set forth below.

### A.  The ADA and Leiter Preclude Agreements Purporting to Obligate the Government For More Than One Fiscal Year

Plaintiff contends that the TPP Program guarantees it funding over a five-year period. HHS never made any such guarantee.  Nor could it have, since the program is funded on an annual basis, and the Anti-Deficiency Act forbids the agency from committing funds for future years.  Because Congress has not exempted the TPP Program from the ADA or otherwise permitted HHS to make multi-year obligations in this context, *Leiter v. United States*, 271 U.S. 204, 206 (1926), is controlling.  *See also Gov't Sys. Advisors, Inc. v. United States*, 13 Cl. Ct. 470, 473 (1987) (explaining that the government chose not to renew the lease at issue in *Leiter* because it "determined that it was in government's best interest not to renew"), *aff'd*, 847 F.2d 811 (Fed. Cir. 1988).  *Leiter* requires the government make a new decision to "affirmatively continue" the grant agreement in each year that a new appropriation is provide.

It is no answer to *Leiter* that HHS retains the right to terminate the grant based on the grantee's failure to comply with the terms and conditions of the grant; this does not suffice under *Leiter*, as that case holds that the ADA is satisfied only if the government reserves the right to "affirmatively continue" the agreement or not in each new year.  *Leiter*, 271 U.S. at 207; *see also* 2 GAO Principles of Federal Appropriations Law ("GAO Red Book"), [4] at 6-54, GAO-06-382SP (3rd ed. 2015), *available at* https://www.gao.gov/legal/red-book/overview ("The reservation of a right to terminate does not save the contract from the prohibition against binding the government in advance of appropriations."); *Comptroller Gen. Warren To The Postmaster Gen'l*, 28 Comp.

---

[4] The Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93–344, § 801(a), 88 Stat. 297, 327 (1974), gives the Government Accountability Office (GAO) specific oversight duties on budgetary matters. *See generally* 31 U.S.C. § 1112(c).  GAO publishes the *GAO Red Book* to advise the public of its views on appropriations law. "Although GAO decisions are not binding, [courts] 'give special weight to [GAO's] opinions' due to its 'accumulated experience and expertise in the field of government appropriations.'" *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quoting *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984)).

Gen. 553 (1949) (concluding thirty-day notice and one-day "for-cause" termination provisions did not cure an ADA violation).  And *Leiter* specifically rejected the idea that conditioning future funding on appropriations was sufficient to ensure ADA compliance.  *Leiter*, 271 U.S. at 206-07; *see also* 2 GAO Red Book at 6-55.  HHS has not yet taken an "affirmative action" under the authority of the FY 2018 appropriation necessary to require payment by the government; instead, it will obligate the funds after a new competition.

As *Leiter* shows, one of the goals of the ADA is to prevent government agencies from entering arrangements that take away the government's ability to control whether an obligation will occur against funds that Congress has yet to appropriate.  Plaintiff's interpretation of the relevant regulations significantly curtails this discretion by leaving agency officials at the mercy of discretionary decisions made years before current appropriations.  Those choices are not mandated by statute or regulation, but under Plaintiff's theory, Defendant must accede to them because the only grounds for breaking off the relationship are tied to Plaintiff's conduct as grantees.  The ADA would be scant protection, indeed, if it was satisfied by an agency's automatic conferral of grant funding upon passage of a new appropriation absent grounds for termination or a lapse in appropriations.

In *Policy & Research*, this Court recognized the ADA's applicability, but held it was satisfied by continuing applications and progress reports submitted by the grantees over the course of the "budget period."  *Policy & Research*, 2018 WL 2184449, at *11.  This Court effectively required HHS to renew funding unless the individual grantee has provided grounds for termination or funding lapses.  Neither of these conditions satisfies *Leiter*'s requirement that the government "affirmatively continue" the relationship each year.  *See Goodyear Tire & Rubber Co. v. United States*, 276 U.S. 287, 293 (1928) ("Not having affirmatively continued the

14

lease beyond the actual period of occupancy, the Government cannot, under the doctrine of the *Leiter* Case, be bound for a longer term."); *Leiter*, 271 U.S. at 207; *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327, 332 (1999) ("Each renewal option must be . . . exercised only by the government's affirmative action."); 2 GAO Red Book at 6-54, ("The reservation of a right to terminate does not save the contract from the prohibition against binding the government in advance of appropriations.").

HHS's discretion over continuation funding is fully consistent both with the nature of research grant funding in general and the TPP Program appropriation in particular, even given the Court's observations that the nature of the appropriation requires multi-year funding commitments. Appropriations are presumed to be "for the [fiscal] year" at issue unless Congress explicitly provides otherwise. 1 U.S.C. § 105; *see also* 41 U.S.C. § 3903(b) (authorizing, in the procurement context, "multiyear contract[s] for the acquisition of property or services" by a federal agency); 1 GAO Red Book at 5-4 through 5-7 (discussing presumption of "annual appropriations" in the absence of congressional guidance to the contrary). HHS does not have "multi-year" budget authority with respect to the TPP Program because the appropriation does not give HHS the authority to create binding obligations that last beyond the current fiscal year, unlike the statute at issue in the GAO decision the Court relied upon. *The Honorable Alan Cranston*, B-239435, 1990 WL 10007871, at *2 (Comp. Gen. Aug. 24, 1990) (addressing statute, 38 U.S.C. § 30, giving the Department of Veterans Affairs authority to "enter into a lease … for not more than 35 years"). The "project period" structure allows HHS to run long-term research from annual appropriations to serve the public' interest in such projects, but nothing in the TPP Program appropriation mandates funding for any particular term of years, and the statute is consistent with a system in which agency officials retain discretion to decide whether to maintain

current research projects or change course if a project is not working or no longer serves the public interest. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984) ("[A]n agency to which Congress has delegated policy-making responsibilities may … properly rely upon the incumbent administration's views of wise policy to inform its judgments….").

Even taking into account the nature of the TPP Program, grantees accept money on a year-to-year basis on the understanding that public research priorities can and do change, and the government can always recompete funds if it concludes a particular program is not serving the public interest. Plaintiff cannot twist that structure inside-out simply because current officials have made a different judgment about the value of Plaintiff's research. The Court should reject the Plaintiff's misreading of the controlling grant documents and interpret the HHS regulations consistent with the proper legal backdrop.

**B. Defendant Has Not Terminated the Plaintiff's Grants within the Meaning of the Department's Regulations**

As explained above, HHS has retained the discretion to consider, with each new annual appropriation, whether to issue continuation awards to existing grantees or whether to hold new competitions. Indeed, HHS must retain this discretion to comply with the Anti-Deficiency Act as the Supreme Court has construed that statute in *Leiter*. Plaintiff contends, however, that HHS committed to provide continuation funding by publishing regulations on terminating grants. This is incorrect because the decision to end continuation funding is not a termination.

"Termination" instead refers to the withholding of grant funding before "the planned end of period of performance." 45 C.F.R. § 75.2. A "period of performance" is "the time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award." *Id.* And the only "time" period in the grant documents consistent with this

16

definition is the "budget period." Work is "authorized under the Federal award" on a "budget period" basis, and the "time during which the non-Federal entity may incur new obligations to carry out" that "work" is that same one-year "budget period." *Id.* (defining "federal award," as relevant here, as "the instrument setting forth the terms and conditions" of the grant, such as the "cooperative agreement"). Future "budget periods" within a "project period" are not "authorized under the federal award" Plaintiff receives annually; they are projections of future funding that will not be authorized until an appropriation is in place and HHS obligates those funds through a NoA entered under the authority of that appropriation. Because HHS has not ended Plaintiff's funding in the middle of a "budget period," there has been no "termination" here that would trigger the requirements of 45 C.F.R. § 75.372-73.

The *Healthy Teen* court held that "grantees may commit funding beyond their current budget period" because the regulatory definition of "obligation" contemplates "transactions during a given period that require payment by the non-Federal entity during the same or a *future period*." *Healthy Teen*, 2018 WL 1942171, at *5. That too is incorrect. A grantee can make an *obligation* during a budget period, which is paid using funds for that budget period, even if the payment is made in a future budget period. But the grantee cannot make an obligation during the current budget period that relies upon funds from a future budget period, as neither funding nor work for the future period has been authorized through an NoA. Yet that is precisely what *Healthy Teen* would permit.

In *Policy & Research*, this Court's interpretation of the term "period of performance" relied heavily on the regulatory definition of "project period," which references the regulatory definition of "period of performance." *See* 45 C.F.R. § 75.2 ("project period, *see* period of performance."); *Policy & Research*, 2018 WL 2184449, at *8-9. The *Healthy Teen* and

17

*PPGWNI* courts adopted similar interpretations. *Healthy Teen*, 2018 WL 1942171, at \*5-7; *PPGWNI*, 2018 WL 1934070, at \*7. The "project period" cross-reference, however, cannot override the plain language of the definition of "period of performance." Otherwise, the definition of "period of performance" would be surplusage.[5]

Nor do the "closeout" procedures of 45 C.F.R. §§ 75.381 and 75.386 support Plaintiff's contentions. Under § 75.381, closeout is only required after "all applicable administrative actions and all required work of the Federal award have been completed." That is, closeout obligations are triggered only when the current grant award ends, with no further work to complete, *and* HHS makes no continuation award. If HHS makes a continuation award, then a new budget period starts, grant funds are awarded, the project continues, and closeout is unnecessary (as "all required work" is incomplete).

HHS's regulations for managing noncompliant or otherwise problematic grantees, 45 C.F.R. §§ 75.371 & 75.207, do not support Plaintiff's position either. They do not address renewals of continuation funding or limit the circumstances under which HHS may withhold continuation awards. Section 75.371, titled "Remedies for Noncompliance," lists actions that an agency may take when a grantee does not adhere to "Federal statutes, regulations, or the terms and conditions of a Federal award." *Id.* It does not speak to or constrain HHS's discretion to issue or not issue a continuation award, a power specifically recognized by the Grants Policy Statement.

Section 75.207 authorizes HHS to add "specific award conditions" when: (1) an awarding agency's risk assessment deems a grant applicant risky; (2) a grantee "has a history of failure to

---

[5] Contrary to the Court's holding, the absence of the term "budget period" in the regulations supports HHS's interpretation of "period of performance." *See Policy & Research*, 2018 WL 2184449, at \*11. It confirms that HHS, in modifying its regulations, did not intend to alter its long-held readings of "project period" and "budget period."

comply with the . . . terms and conditions of a Federal award"; (3) a grantee "fails to meet expected performance goals"; or (4) a grantee "is not otherwise responsible." § 75.207(a).  It then provides a non-exclusive list of conditions that may be imposed under such circumstances, including "[w]ithholding authority to proceed to the next phase until receipt of evidence of acceptable performance within a given period of performance." § 75.207(b)(2).  Nothing in § 75.207 addresses the agency's discretion to renew or not renew grant funding, and it does not purport to limit the circumstances under which HHS may exercise such discretion.  The proposition that regulations supersede conflicting policy statements—*see PPGWNI*, 2018 WL 1934070, at *3—is irrelevant.

HHS has long understood that withholding funding for remaining, future years of a "project period" is not a "termination."  This approach is supported by other regulations that were left unchanged in HHS's 2014 revisions to its grant administration guidelines, as well as HHS's standard terms and conditions for grant awards, which were last revised in 2007.  *See* 45 C.F.R. pt. 16, App'x A, at C(a)(2)-(3) (stating jurisdiction of HHS's departmental appeals board, which distinguishes "termination" from the denial of a non-competing continuation award within a project period); 42 C.F.R. § 50.404(a)(1), (4) (same); *In re Nw. Rural Opportunities, Inc.*, DAB 324, 1982 WL 189564, at *1 & n.1 (1982) (discussing changes to regulations regarding termination made in response to *Southern Mutual Help Association v. Califano*, 574 F.2d 518, 526 (D.C. Cir. 1977)); Gerardi Decl., Ex. B, I-33 through I-34, I-89 through I-90.  When HHS promulgated the modern regulations at issue in 2014, it dispensed with notice and comment rulemaking for changes such as the definition of "project period" because these changes "already exist[ed] in codified regulations … and thus are currently applicable to HHS grantees.  As such, all HHS grantees should already be in compliance with these provisions.  … [N]o changes on the

part of grantees are expected." Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75,871, 75,875 (Dec. 19, 2014). The regulatory linkages relied upon by Plaintiff were not intended to changes grantees' relationship with HHS, and HHS did not even revise its standard grant terms and conditions in light of these regulatory changes. But the Court's interpretation of the regulations would transform them into a major substantive revision of the terms of all HHS grant instruments. That result must be rejected.

### C.  The Terms of the Grant Awards Support Defendants' Position

This Court in *Policy & Research* relied on statements made in funding opportunity announcements for the TPP Program as well as other informal guidance. *Policy & Research*, 2018 WL 2184449, at *10-11. But these arguments run afoul of the actual terms of the grant award that each grantee accedes to when it draws down grant funding. Each Notice of Award states that future budget period years within a project period are "projections" based on the agency's present intentions. Authorization for future years of work within a "project period" would require, at a minimum, submission of a continuation application, an appropriation by Congress of the necessary funds, and the execution of a new Notice of Award that obligates the necessary funds and permits the Plaintiff to continue its work. Statements in the funding opportunity announcements and other informal agency guidance relied upon by Plaintiff and the Court, *PPGWNI*, 2018 WL 1934070, at *7 n.3, must be read in light of the regulations and the grant terms and conditions Plaintiff actually accepted when it drew down funding. The funding opportunity announcements themselves state this to grantees up front. Gerardi Decl., Ex. A, at 68. In any event, statements about a "period of performance" and "project period" of "*up to* five years," or a "five-year funding period," track HHS's longstanding position that grantees have no guarantee of funding through the end of the "project period."

Moreover, even if these statements could bind the government (they cannot), they must be read in harmony with the ADA and guidance provided by the agency.  This includes the Grants Policy Statement ("GPS") referenced in the funding opportunity announcements and incorporated into the award notices, which provides that the "projections of future funding levels" during a "project period" "are not guarantees that the project or program will be funded or will be funded at those levels" and "create no legal obligation to provide funding beyond the ending date of the current budget period as shown in the NoA."  Gerardi Decl., Ex. B, at I-34. HHS can choose to compete a grantee's funds instead of renewing continuing support if it concludes, "[f]or whatever reason, continued funding would not be in the best interests of the Federal government."  *Id.* at II-89.  That choice is different in kind from a "termination," which is treated separately in the GPS and the regulations.  *Id.* at II-89, II-90; *see also* 45 C.F.R. pt. 16, App'x A, at C(a)(2)-(3); 42 C.F.R. § 50.404(a)(1), (4).  Plaintiff accepted these provisions when it drew down funding and cannot ignore them when categorizing Defendants' representations about the terms and conditions of the grant.

### D.  Because No Grant Was "Terminated," Plaintiff's APA Claim Fails

Decisions on how to allocate funds in a grant program, such as the decision whether to issue continuing grant awards or recompete a grant program, are presumptively "committed to the agency's discretion by law" under 5 U.S.C. § 701(a)(2).  *Lincoln v. Vigil*, 508 U.S. 182, 192-93 (1990); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002) (holding, under *Lincoln*, that an agency's choice between different options for allocating moneys for economic losses under a farm subsidy program were presumptively unreviewable under § 701(a)(2) and *Lincoln*).  Although the Court in *Policy & Research* did not accept Defendants' argument regarding "termination" (which, as explained above, was error), the Court correctly framed the dispute as a question of whether or not HHS had circumscribed its own discretion by regulating

21

the conditions under which a non-competing continuation award could be withheld.  *Policy & Research*, 2018 WL 2184449, at *7-8.   And, aside from "termination," no grantee has identified a manageable standard for judicial review of HHS's decisions over whether to compete grant funds or issue awards on a continuation basis.  As such, HHS's decision with respect to Plaintiff's grant was "committed to agency discretion as a matter of law" and not subject to this Court's review.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion, grant Defendants' cross-motion, and dismiss Plaintiff's complaint with prejudice or, in the alternative, enter judgment in HHS's favor on Plaintiffs' claims.

Dated:  May 18, 2018                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JESSIE K. LIU
United States Attorney

JOEL McELVAIN
Assistant Branch Director, Federal Programs Branch

RUTH A. HARVEY
Director, Commercial Litigation Branch

MICHAEL J. QUINN
Senior Litigation Counsel, Commercial Litigation Branch

/s/ *Michael J. Gerardi*
Michael J. Gerardi
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch

22

20 Massachusetts Ave. NW, Room 7223
Washington, D.C. 20530
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.gerardi@usdoj.gov

/s/ *Jonathan E. Jacobson*
Jonathan E. Jacobson
Alicia M. Hunt
Trial Attorneys
United States Department of Justice
Civil Division, Commercial Litigation Branch
1100 L St. NW, 10th floor
Washington, D.C. 20005
Tel: (202) 353-7971
Fax: (202) 514-9163
E-mail: jonathan.e.jacobson@usdoj.gov

*Attorneys for Defendant*